173048 H. Davis v. Lifetime Capital. The parties on appeal, H. Thomas Moran II v. Robert G. Burgess, et al. Arguments not to exceed 15 minutes per side. Mr. Johnson for the appellant. Good morning. Good morning, Your Honor, and my name is Stephen Johnson. I'm counsel for the appellants who are viators, investors in viatical instruments. I am reserving five minutes of my time for my rebuttal comments. As I stated, my clients are investors in viatical instruments, which gave them the right to death benefits on life insurance policies. The insured was a Mr. Jordan who passed away on the 4th of February, 2004. So come Sunday, it will be 14 years since the death of the insured. And this appeal relates to my clients' assertion of their rights as the owners of the death benefits for those life insurance policies. And as Judge Griffin said, we understand that. The concern, though, is even though he died on the 4th and the conservator, the receiver, pardon me, was not appointed until sometime later, bonds hadn't been distributed, but the lifetime had still had some interest at that time, did they not? Even though you say they had no interest. That's right. They didn't even have a beneficial. They had no beneficial interest. Okay. But what about all these other investors? Because under the facts of this case, it appears that the way this operation ran, other investors had to pump in money to keep the thing afloat. Had that not happened, it would have lapsed and your clients would have had no expectation of receiving anything. That is an argument that has been made in this case, but there has been no effort to establish in the record that there was any type of commingling that meant that my clients, when they invested their monies, that those monies did not actually go to the acquisition of their irrevocable beneficial interest in the death benefits. And if I may, Your Honor, that matter has been taken up in the Liberty Capital case, which is precedent of this circuit, the Sixth Circuit, relating to a similar situation, much simpler facts, where the claimant there was a sole individual claiming the death benefits because the insured had died before the receivership came into play. The same type of circumstance arose and it went to the district court for a decision. The court below in the Liberty case rejected the beneficiary's position on the basis that the court believed that it was more equitable to actually have the death benefits part of a pool of assets to be paid to all of the insureds. And if I may, the Liberty case, which is at 421 Fed Third 377, which was decided in 2005, and the court decided that it would terminate the rights of the claimant in that situation because he engaged in a balancing of interests between those fortunate enough, this is the court's characterization, to have been matched, which is to say with the policy of the decedent at that time, as contrasted to those not matched and were therefore part of a more general pool of other viatical instruments in this then also failing instance. And he said that it was a balancing act which we as judges are required to undertake, and he concluded that the court acting in equity is under a duty to fashion a methodology of disbursement which will do equity and comfort with what are generally notions of fairness and justice, and therefore he denied the specific interest of the beneficiary of the particular policy and said that the equities of the grander or greater pool of investors in the viaticals with this company would take precedent. This court... What would their role have been, what would their interest have been, simply a possessory interest? Lifetime. Lifetime had no interest. Okay, but I'm saying had there been no appointment of the receiver. I'm just trying to go back and understand because obviously this works far differently than a trustee in bankruptcy or something because that's operating pursuant to a particular statute. So had there been no appointment of the receiver, I'm still getting at what if any interest Lifetime would have had, and you say nothing more than a possessory interest until they distributed, is that correct? I could stand corrected, but I believe, Your Honor, that there was not even a possessory interest on the part of Lifetime. Well, the funds would be to the trustee of Lifetime, were they not? There was an insurance trust set up. And that's the proceeds were payable to the insurance trust with the Citibank. That's right. So the funds came to Citibank, and you're saying, no, the funds should have come to your investors instead of Citibank? Is that what you're saying? No, Your Honor. What I'm saying is the trust that was set up that caused the death benefits to go to Citibank for disbursement to those who had the irrevocable beneficial interest meant that Lifetime Capital, Inc., the corporation, who had originally purchased the policies, had no interest. Okay. Well, the trust for Lifetime does have the interest, and the receiver stands in the shoes of the trustee of the trust, does he not? No, Your Honor. No? Why not? Because the trustee stands in the interest of Lifetime Capital, and by virtue of the trust, Lifetime Capital does not have the ownership interest in the race of the trust. Lifetime Capital has its own assets. Okay. The receiver has no relationship to the trustee of the trust. Is that your position? Yes, Your Honor, that's correct. That seems rather odd. Why would you set up the receivership then? The receivership was set up to preserve the assets of Lifetime Capital. Okay. If the assets don't go to the trust and Lifetime Capital has no interest in those assets, it doesn't seem like the receiver would have anything to do. Well, it would certainly have to guarantee that the interest that Lifetime Capital had and the obligation to pay the premiums and so forth continued to operate. It seems like a very limited view of the court's order. You're looking toward it. Now, your principal claim is conversion. You're arguing that the receiver is liable for conversion for following the magistrate's orders in this case. I mean, can you cite me another case where a party has been found liable for conversion for following court orders? I cannot, Your Honor. Okay. I'm sorry. Isn't that kind of the end of your claim? No, Your Honor, it is not. There are situations where, and I believe the distinction that should be kept in mind here, is that while we are claiming that the receiver personally may have acted to misrepresent, among other things, to the district court matters relating to the particular funds here, and the receiver personally may be individually liable for violating the immunity set out in the order impaneling the trustee, we also are saying that simply his possession as violating the ownership interests of my client is wrongful under the law and would be wrongful even though it's subject to a court order. That's correct, because the court order does not, has not, never has, determined the ownership interest issue, and that is the main reason why we are still here after 14 years. I can see you appealing the magistrate's orders, but not suing a party for conversion for following those orders. That's all. No, no. We came into this. That's what you're doing. Maybe I can try to sort it out by saying that what we had here is those with an interest in the ownership of the death benefits here had to have a way of presenting a claim for that ownership that had been asserted throughout the administration of the receivership. Was that the 2012 appeal that you did that we rejected in our order in 2012? You affirmed the district court's ruling. That was your due process argument that you're raising again on this appeal, but we rejected it back in 2012, did we not? It's not the same due process argument, Your Honor. But what the court affirmed was the trial court's determination that there had to be a level of intervention into the receivership for us to assert the ownership interest in the policy proceeds. So we went back and intervened. The court also, the Sixth Circuit, when they affirmed that, said clearly that the ownership issue, who owns the death benefits by virtue of the timing of Mr. Jordan's death, the timing of the receivership order, and so on, who actually has the vested ownership interest in those proceeds had not been decided at that point, and we were not barred from bringing that issue forward. So we intervened. The court allowed the intervention, and we asserted the claim. We sounded it in conversion to say that the receiver, as the officer of the court, continued to wrongfully possess the property in derogation or contrary to our ownership rights, but not in a situation which challenges the immunity that was set forth in the receiver's position in the impaneling document. It's simply saying that it was wrong, and I see my time has expired. You've got five minutes for rebuttal. You can use them now. Use the time now, or you can save it. I will save it and come back. Any further questions, Judge Merritt? Thank you, Your Honor. Thank you. You all have your full rebuttal. Good morning. Good morning, Judge Griffin. Thank you, Judge Merritt, Judge Donald, counsel. May it please the court. Rightly or wrongly, when it came time for us to file a summary judgment motion, we took a rifle shot based upon a statute of limitations because, yes, they had but one claim, and that was a somewhat unusual conversion claim, and it was so clearly untimely that we chose to pursue that as the basis for our summary judgment motion alone, and we stand by that. These investors knew about this issue since, really, 2004, when the receiver brought it to the court's attention, posted it on his website, mailed a notice out to all of the investors. They sat on their hands for ten years, and when that ten years was coming to a close, they chose to file a complaint with but a single claim. That was for conversion. Our position is that a two-year Oklahoma statute of limitations applies, and if it doesn't, then a four-year statute of limitations applies, and whether it's two or four or six, their conversion claims were clearly untimely, and on that basis this court can affirm the summary judgment that was granted to us in the trial court. Again, rightly or wrongly, I think part of the reasoning for taking that rifle shot was to avoid some of the questions about who owns what, but let me bring some clarity to those things because I think there wasn't so much clarity a few minutes ago. The appellants want to draw an analogy to the Liberté Capital case cited by counsel that I refer to as the Monkern case. There was a companion case to that. As a matter of fact, I think this came out of this court a couple weeks later. It's, again, a Liberté Capital group versus Capwell, but this is 148 Fed Appendix 426, and I think it's constructive to consider whether this case bears more of a resemblance to the Monkern case or to that, what I know is Cravello case, and the answer is it clearly bears more of a resemblance to the Cravello case. Let me talk about some of the differences between the Monkern case and what we have here factually in the way of the interest that these investors hold in the funds they say are theirs and always have said are theirs. First off, Ms. Monkern was the sole beneficiary of the policy that was at issue in her case, and she paid to be that sole beneficiary. It was a deal between her and the insurer. Here, these investors didn't do a deal with Mr. Jordan, the insurer, who died shortly before Steve was appointed. They simply made an investment with lifetime capital, and as really nothing but a random act, got assigned to his policy. And by the way, these are a handful of folks. In total, there were about 200 people who had little bits of the $6 million that ultimately came in arising out of these two insurance policies. So what's the legal impact of that assignment that Lifetime made, promising them the benefits from those policies? Is there one? I don't think there is. I mean, they have an interest as an assignee, and to bring some clarity, as far as the ownership of the policy and the various relationships, as Judge Griffin, I think, touched on, the policies were owned by a life insurance trust. It was U.S. Bank who was the trustee over that trust. Lifetime Capital was beneficiary of that trust. The receiver, his order of appointment was broader than what was there in the Monckhorn case, by the way, and specifically gave him the authority over those trusts, all the insurance policies, and the proceeds of any insurance policy. In other words, he exercised dominion and control over all of that. He's exercised dominion and control from the beginning, and it was perfectly rightful, and it was pursuant to a valid court order. So, you know, whether you want to call the defense to the conversion claim, given those facts that everything he did was authorized, whether you want to call it an affirmative defense of a privilege or immunity, or simply that it wasn't a wrongful act in the first place, either way, the conversion claim they filed goes nowhere. On the issue of due process, they keep wanting to make this a due process claim. They've known about this for, again, at this point, 14 years. There were a number of other investors like them who, a dozen years ago, made appearances and put forth arguments and ultimately chose to accept what truly was a very favorable settlement to them. All of the 200 or so other investors who were affected by this issue settled, and these folks chose not to, which is certainly their right. But to suggest that they haven't had the opportunity to be heard, and that's all the due process owes them, is noticing the opportunity to be heard. Not only have they been heard, they've been to this court before on a very similar issue. Would your statute of limitations defense apply to the due process claim? I think it does, Your Honor. Because the due process claim, the court has issued a series of orders, the fairness hearing, and then additional opportunities for them to get in the case, and it seems like it's kind of a moving target as opposed to conversion. I think you can look at a date that everything happened, but due process concerns all these orders that went on throughout the years, I mean, I think, didn't it? I mean, it's hard for me to see how due process is barred by the statute unless maybe it's a two-year statute. I don't have a good, clear answer for you. I apologize for that. I would suggest that – Well, I mean, you started out by saying we could resolve this on statute of limitations. Yeah. I think you're probably right on conversion, but I'm not sure you're right on due process, that's all. And a fair point, Your Honor, they certainly have had the opportunity to be heard, and again, like some others who were involved in these policies, they were heard. Did we resolve the due process claim in 2012 by our order? I don't think so. Okay. Not necessarily, because that had to do more specifically with the settlement process. All right. A portion of it was resolved, but not the whole thing. Yeah. Okay. I think that's right. Excuse me. Have there been any attacks on these type of contracts on public policy grounds, so far as you know, incentives to shorten the life of someone? There have been a lot of attacks, up to and including criminal, of the criminal variety. The man who ran this – well, the longer-term answer is it's become sort of mainstream at this point. There used to be a problem about public policy. There used to be a problem. There was a lot of fraud. The man who was behind the scheme here is still in federal prison, and he's not the only one who's in prison as a result of it. But the practice of doing this is ongoing, and it's even advertised from time to time on television. When I started this 14 years ago, there were no commercials. Now there are. So it has gone somewhat mainstream. And with that, on the bright side, there's some regulation that hopefully protects people against the sort of fraud that happened here, which included making up – ultimately making up life expectancies to make it look like people were going to die sooner so investors would get their money back quicker and their returns would be higher. So hopefully that doesn't happen like it used to. The – I think counsel was asked about who paid for these policies, who kept them alive, and the answer is everyone. These Jordan policies were purchased with pooled money. You can't trace these investors' investments to the purchase or upkeep of these policies at all. It really was a team effort. And to elevate the interests of these investors above the others would be inequitable. With that, I'll rest. All right. Any further questions? Judge Merrick. All right. Mr. Johnson, you've got five minutes for rebuttal. Before you start, what damages do you seek in this conversion claim? You represent six of the 200 investors suing the receiver for conversion. What money damages are you asking for? Well, we're asking for certainly the damages that came from the promised payout when they received the irrevocable assignment. Are you asking for 3% of the proceeds, I mean for the six of the 200, or are you asking for the whole $6 million for the six people? Well, it's not the whole $6 million, Your Honor, just getting into the numbers. Because three of it, $3 million, were paid out to the other. I know. Are you seeking that money too? No, no, no. We are seeking what remains as the ownership. We are seeking to establish that these individuals own the death benefits that have remained to be. These six own the other $3 million? Logically, yes, Your Honor. That's your position? That is our position. But at a starting point, certainly what their ownership interest was, was at least for the payout reflected in the irrevocable relinquishment of rights by the trustee and by lifetime in favor of the beneficiaries. But what we know from the record is that there was a representation that the receiver had the $4 million, or $3.9 million, and had a contingency plan to refund that to the rightful owners once the ownership issue was decided. And throughout, contrary to what Magistrate Ovington said, there has never been a decision, a determination, as to who owns the death benefits on Mr. Jordan's policies. The entire process, first of all, the receiver recognized that that was a legitimate question, that when Mr. Jordan died, before there was ever a receivership, the operation of the trust documents and everything should vest with my clients as the remaining people the ownership of the death benefits. And I asked you before, but why not to the trust that was set up with Citibank or U.S. Bank? Which is the way I read the documents. I can't, Your Honor, tell you that I'm as steeped in the trust document and so on. Well, that's pretty important, isn't it? Well, actually, the trust then had the obligation and had conveyed to the beneficial owners the irrevocable interest in the death benefits, I believe. That that had been done by the trust before the decedent passed away. There was nothing by operation. It wasn't for the trust to make a determination. That's where the death benefits would be paid. The beneficial interest was, I believe, the insurers. So at the time that that happened, going back to the question you had raised initially, Judge Donald, had there been no trustee and Lifetime had been continuing to operate, all of the full death benefits would have been paid to the people who had those what are called partial revocation of rights granted by Lifetime and the trustee. Has there been a lot of litigation over these type transactions about life insurance proceeds? Is it a highly litigated area of law, as far as you know? I can't tell you, Your Honor. Obviously, there's the Liberty capital viatical instance. There's this one, Lifetime Capital, and there's at least one other, all of which are in receivership. Now, whether there's been litigation involving pooling of death benefit proceeds or ownership in the situation when you have vested ownership of the death benefits, I'm not that well steeped in it. But one thing that does come to mind is that these outfits, like Lifetime, like Liberty, they operated for years before they ended up in the receivership, and they paid in accordance with their contracts to people who had interest and other people who died before there was an issue. There's been no effort by the receiver or anybody else to claw back against those individuals who, if there's going to be a broad concept of equity in pooling all of the proceeds, that would be as logically fruitful an avenue as the one that's being pursued here. The Liberty capital case, Your Honor, I started to highlight for you how the court treated that equitable argument, the argument that springs from the characterization that there has been commingling of payments, the characterization that everybody is in the pool and so on. The Liberty capital court, this court said in that situation that you must provide due process and that there is a distinction of fairness hearing and other hearings of that nature do not stand in the shoes of determination of ownership once that ownership issue comes up. And that matter remained at large throughout. And for that reason, once we were allowed to intervene, we continued to take advantage of the rights that the court had said we had to assert our ownership interest. Whether it was properly characterized as a conversion to seek from the race of the receivership what the receivership has possessed all along, which is the death benefit that should have been dispersed before the receivership started. All right. Now, my time is well past. Any further questions?  All right. Thank you very much for your arguments. Thank you for your time and attention. Case will be submitted. May call the next case.